Toomey, J.
PRIOR PROCEEDINGS
On August 13, 1998, a Bristol County Grand Jury returned two indictments accusing defendant of assault and battery and filing a false police report. The incident giving rise to the indictments had occurred on January 2, 1998.
After his arraignment on August 26, 1998, defendant sought, by motion, to be placed on pre-trial probation under G.L.c. 276, §87. On September 3, 1998, after hearing and over the objection of the Commonwealth, this Court allowed the defendant’s motion. The Court ordered that defendant be subject to probationary supervision for a term of one year and that, as conditions of the probation, defendant was obliged to:
1. participate in anger management counselling at the discretion of the probation department as to intensity and duration;
2. perform fifty hours of community service at the direction of the probation department; and
3. pay a probation supervision fee of $45.00 per month.
The Court both denied the Commonwealth’s request for a statement of reasons supporting the establishment of a G.L.c. 276, §87, probation and overruled the Commonwealth’s objection to a dismissal it feared might occur at the completion of the probationary period. The Court’s response was based on its view that Commonwealth v. Brandano, 359 Mass. 332, 337 (1971), did not require such a statement at the inception of a G.L.c. 276, §87 probation and on the reality that defendant had not sought a dismissal.
On September 28, 1999, this Court entertained defendant’s August 27, 1999, motion to dismiss the indictments. After hearing, at which the defendant contested the Commonwealth’s request for an eviden-tiary hearing, the Court ruled that the Commonwealth was indeed entitled to a hearing on the question of dismissal. See “Memorandum Order on Defendant’s Motion to Dismiss” issued by this Court on or about October 25, 1999.[1] The hearing commenced on December 21, 1999 and the following facts have been found based on the evidence adduced at that hearing.
FINDINGS OF FACT
A. The Incident at the House
On January 2, 1998, defendant and other officers of the Taunton Police Department responded to calls from the Crossroads Halfway House. That facility was a group residence for teenage boys who, because of emotional “problems” and attendant acting out, had been referred by state authorities to the House. Taunton police were fairly regularly summoned to quell disturbances at Crossroads.
Upon their arrival the police found a rather chaotic situation. Residents had engaged in a melee in which fire extinguishers had been discharged, a counsellor had been struck in the eye by the extinguisher foam and substantial vandalism (broken windows, punctured walls, broken furniture) had occurred throughout the facility. Jonathan, the victim at bar, had been restrained by the Crossroads staff after breaking two windows and punching through a wall.
The police learned that three of the residents were ringleaders of the disturbance. One of the three, Jonathan, had been arrested several weeks earlier in connection with another episode of vandalism. When the police gathered the three to inquire as to events at the facility, a staff supervisor advised defendant, “they are out of control . . . don’t be nice to these kids,” an admonition uttered because the staff believed that a sympathetic, conciliatory approach to the three by the police would not, due to the seriousness of their rampage, be appropriate.
Defendant commenced an oral “general chastising” of the three suspects. One boy — not involved in the vandalism — began to give a counsellor a “hard time” and was “starting to get a little out of hand.” Jonathan was “cocky,” mumbling under his breath and acting as a “wise guy.” Defendant threatened to beat Jonathan who responded with a taunt, “maybe I can throw in a couple of doughnuts.” Jonathan was afraid of defendant, but made the “doughnut” comment because he “didn’t think [defendant] was going to do anything.” Jonathan wanted “to show like how tough I am and whatnot ...” Defendant then delivered an open-handed slap to each side of Jonathan’s head. Defendant wore leather gloves at the time.
Defendant authored a police report that accused Jonathan of spitting on him. That accusation was false and was apparently offered to justify defendant’s slapping of Jonathan.
B. The Probation
As noted, supra, the Court ordered that defendant be placed on a G.L.c. 276, §87, probation, with conditions, for a period of one year. Defendant satisfied all the conditions and his probation was terminated on schedule. The conditions and defendant’s performance thereof were as follows:
1. Defendant was required to report every two weeks to his supervising probation officer. That officer testified that he saw defendant regularly, often more frequently than the required fortnight. Defendant was invariably punctual, cooperative and responsive to all the officer’s inquiries. Defendant applied for and received, during his probation, permits for out-of-state travel to accompany his son on college admissions ■visits. The probation officer made home visits to defendant’s residence; defendant was, occasionally, *195 not at home and the officer spoke with defendant’s wife and sons. Nothing untoward was revealed by the home visits.
2. Defendant was obliged to complete a one-year course of anger management counselling. He was cooperative with his counsellors, treated the counsel-ling as an opportunity for self-improvement and satisfied all the requirements of the program. Additionally, his probation officer had opportunity, on a number of occasions, to observe defendant’s conduct in stressful circumstances on the street. The officer reported that defendant handled the stressors appropriately and noted defendant’s “calmer” reactions. The probation officer concluded that defendant was a “good probationer” and overcame the very real difficulties inherent in serving as a police officer under a court-ordered probation order.
3. Defendant satisfied his community service obligations by performing fifty hours of maintenance work at the Taunton High School. The fact that the work was done without incident at a facility frequented by persons of Jonathan’s age group is not without significance.
C. Other Circumstances
1. While defendant was serving his probation, City Council hearings addressing the Crossroads House incident and his fitness to continue as a police officer were broadcast on local cable television and radio and were covered by the local print media.
2. The Council suspended defendant, without pay, for a period of sixty working days on account of the incident at bar.
3. After he was reinstated to office, defendant served as a dispatcher until he was promoted within the Taunton Police Department to the position of “Community Police Officer,” a posting that required him to walk a “beat” and engage regularly with the citizens of Taunton. His duties required him to respond to neighborhood concerns, especially those involving low-income youth. The promotion was approved by a Board composed of the Mayor, Chief of Police and community representatives.
4. Defendant experienced a substantial income diminution as a result of the incident. He has paid $45.00 per month as a probation supervision fee. He was deprived of the 15% salary up-grade ($7,800) that compensates the “Detail Hiring Officers,” a position defendant held for the ten years prior to this suspension. His lost salary (including pay for off-duty details) during his suspension amounted to $28,000. He was required to pay the full premiums upon his family health insurance policy during his period of suspension; those premiums totalled $3,200.
5. In addition to the court-ordered community service component of his probation, defendant engaged voluntarily in service activities with the following organizations: Board of the Taunton Committee on Human Services; Executive Board of Taunton Youth Coalition; Board of Directors of Taunton Reaching Youth (for whom he provided anti-drug abuse and youth pregnancy counselling); and the Youth Library Program in which he promoted literacy in several Taunton elementary schools.
DISCUSSION
A. Applicable Law
This Court recognizes the constitutional prerogative of the District Attorney as to whether and when to press a prosecution. Article 30 of the Massachusetts Declaration of Rights. Nothing is more fundamental to our system of justice than that principle of the separation of powers which compels the Judiciary to forbear from interference with the Executive’s decision to proceed with a prosecution. See, generally, Commonwealth v. Brandano, 359 Mass. 332 (1971). Accordingly, a court is constrained to pay deference to a District Attorney’s determination that a prosecution ought go forward and to forego any inclination to halt a prosecution merely because the judge considers that subjecting the accused to the criminal process is inappropriate.[2] Notwithstanding that powerful, basic constitutional limitation upon the judicial authority, Massachusetts law does provide, in those rare instances where public justice will be better served by not prosecuting, that the judiciary may foreclose an otherwise lawful prosecution.
In Commonwealth v. Brandano, 359 Mass. 332, 337 (1971), the Supreme Judicial Court declined to decide “the ultimate question of constitutionality” of a judicial dismissal grounded on circumstances other than the unlawfulness of the prosecution. Nevertheless, the Court suggested that, if, after observing certain procedural niceties, the trial judge is persuaded that the “interests of public justice” favor dismissal, then dismissal might be within “the power of the courts to act in appropriate cases.” Id. Even though Brandano did not, we must concede, explicitly endorse dismissal as within the judicial capacity, Brandano’s choice of language, to wit, “[t]his procedure . . . recognizes the power of the court to act in appropriate cases,” id., is a clear signal that there are circumstances, necessarily extraordinary, in which a trial judge might dismiss without trespassing upon article 30.
More recent decisions do not erode the Brandano principle and, indeed, endorse its rule. In Commonwealth v. Pellegrini, 414 Mass. 402 (1993), the Court held that the trial judge’s determination that defendant’s privacy rights had been abridged during the investigative phase was erroneous as a matter of law and, accordingly, her dismissal of the indictment was ultra vires. Pellegrini stands only for the proposition that a dismissal based upon an erroneous ruling of law cannot prevail. Pellegrini did not address an “interest of public justice” dismissal as is proposed at bar. And, in Commonwealth v. Thurston, 419 Mass. 101, 104 (1994), the Court conceded that, “as a gen *196 eral rule, a judge may not dismiss a legally valid indictment over objection by the Commonwealth,” but then restated the Brandano procedure, expressly iterating Brandano’s reference to the judge’s function of “conclud[ing] that the ‘interests of public justice’ require a dismissal. . . ,” id., and undertaking to “examine whether ‘the interests of public justice’ require a dismissal in light of the findings of fact and reasons advanced by the judge.” Id. at 105. Finally, in Commonwealth v. Pyles, 423 Mass. 717 (1996), and Commonwealth v. Taylor, 428 Mass. 623 (1999), the Supreme Judicial Court alluded, albeit in differing contexts, to the continuing viability of the Brandano procedure as one leading, in deserving instances, to dismissals over the Commonwealth’s objection.[3]
We are left then, with the conclusion that Brandano, and its suggestion that a dismissal “in the interests of public justice” is not barred by the article 30 allocation of functions, is still good law. Our task now is to determine whether the facts and circumstances at bar suggest that “public justice” will be better served by dismissal of the indictments than by continued prosecution of defendant.
B. Factual Analysis
For defendant to have responded as he did to Jonathan’s taunt was contemptible and indefensible. No matter the cutting nature of the remark, a police officer is required to conduct himself with restraint and not surrender to his baser urges. Indeed, in the view of this Court, a police officer ought be held to a more exacting behavioral standard than that which society imposes on those who are not schooled in the techniques of law enforcement and who have not sworn to uphold the law. The acts of slapping Jonathan and filing a false police report have earned defendant this Court’s censure.
That disapprobation does not, however, end the inquiry. That defendant’s conduct was unprofessional and, indeed, criminal does not lead inexorably to the conclusion that he ought to be prosecuted. As determined supra, Massachusetts law does contemplate that, in circumstances where public justice would not be advanced by prosecution, a court may decline to permit an indictment to be pressed by the Commonwealth even though a conviction might legitimately ensue. At bar, the circumstances do suggest that public justice will be better served by dismissal than by continued prosecution. Let us now examine those circumstances.
Defendant’s conduct occurred in a context which, while providing him no excuse, does offer some useful insight into the impetus for his behavior. The Crossroads House had been seriously vandalized by its residents, the staff had urged that the police adopt a stern approach to the perpetrators, and Jonathan had taunted defendant with an expression to which police officers are, perhaps unreasonably yet nevertheless commonly, quite sensitive. While criminality by the residents, staff impatience and Jonathan's insulting cockiness do not constitute the sort of provocation that would justify defendant’s response, they do enable us to assess the stressful and provocative environment in which defendant acted.
When we measure defendant’s conduct, in that context, against the negative consequences that have already been visited upon defendant, to wit, the probation, the public scrutiny, the suspension, the financial deprivations and the ineradicable mark on his record, it would seem that public justice would not be interested in further pursuit of prosecution. And, given the progress defendant has made in connection with personal growth — his calmer response to stressors, his positive involvement with youth and his dedication to community activities — public justice certainly would gain little were prosecution to proceed. Finally, this Court notes that community authorities, who may be expected to reflect in their doings the public’s view of justice, have reinstated defendant to the police force, have promoted him within the Department and have entrusted him with duties that will likely bring him into contact with the very stressors that prompted his conduct at Crossroads House. A better gauge of the interests of public justice than the actions of those who are responsible for the well-being of the community might be difficult to find.
CONCLUSION
The “interests of public justice” is an imprecise standard, necessarily so in order that it maybe applied by courts to circumstances that are unforeseeable as of the time the standard became law. The authors of Brandano could not have imagined all the facts that might drive an analysis such as has been engaged at bar. Accordingly, the Brandano Court has charged trial judges with the responsibility of applying the “public justice” litmus to whatever set of facts are found to pertain to the matter in suit. The judges must then determine what outcome will best comport with the community’s interest in fairness. In the exercise of that authority, this Court has concluded that the “interests of public justice” will be best satisfied if the instant prosecution proceeds no further.
ORDER
Defendant’s Motion to Dismiss Bristol County Indictments No. 9873CR0260 A & B is ALLOWED.

The contest pitted the Commonwealth's demand for an evidentiary hearing to aid the court in its Brandano determination on the “interests of justice" issue against the defendant’s insistence that, because the Commonwealth had not traversed the fact of defendant's satisfactory performance on probation, there was no occasion for an evidentiary hearing. The Court ruled that the Commonwealth had the better of this preliminaiy skirmish.

The Court is empowered, of course, to halt a prosecution for reasons of law (i.e., a statute of limitations violation, insufficiency of evidence, constitutional error) and nothing in the doctrine of separation of powers erodes that power. But, the matter at bar does not implicate such an exercise of judicial authority. There are no legal impediments to the *197 Instant prosecution. Rather, this Court addresses the question of the "public justice” in pressing the present indictments.

Pyles commented that, ". . . the Legislature was undoubtedly aware of the decision in the Brandarlo case, which created a practice concerning the dismissal of a criminal charge that has been used for twenty five years without substantive challenge . . Pyles at 727 (emphasis added). Taylor cited Brandano for the proposition that a judge must conduct a hearing and record findings and "reasons for dismissing cases over Commonwealth's objection." Taylor at 629. Surely Pyles and Taylor powerfully support the view that dismissal for reasons of justice remains, in appropriate cases, a constitutionally permitted result.